Now I'm going to hear the case of Marks v. Colorado Dept. of Corrections, 1911-14. Good morning, your honors. May it please the court, Michael Fairhurst appearing on behalf of the appellant, Nancy Marks. Fundamentally, this is a case about disability discrimination and failure to reasonably accommodate. There is strong evidence of both here. Regarding the intentional disability discrimination issue, the letter describing the reason for Ms. Marks' regression from Community Corrections back to prison, it explicitly states that because she can't work because of her medical conditions, she's being regressed. As for failure to reasonably accommodate, the testimony was consistent and clear that no effort was made to accommodate Ms. Marks' disabilities while she was in Community Corrections before she was removed from the community and placed back into prison. Why is that relevant? The defendants didn't even, they didn't brief that here, nor did they even brief that in their motion for summary judgment of whether there was actually failure to accommodate. Or, for that matter, by intervention, disability discrimination or a violation of the Rehabilitation Act. Sure. Well, the state's position in large part seems to be that it can essentially contract its way out of liability under Title II and the Rehab Act. And as this court held, the Tenth Circuit in Phillips v. Tiona, regulations issued by the Attorney General, quote, suggest that states may not avoid the responsibility to provide services to disabled prisoners by contracting their way out of those obligations. Prison assignments should not make a material difference. Now, another issue related to that, that the state seems to have argued and Judge Mage, the district court, seems to have credited as well, is the concept that under state law, the Community Corrections program here could perhaps have regressed Ms. Marks without the state challenging it. But the fundamental issue here is federal law. And as this court held in Phillips v. Tiona and the Ninth Circuit likewise held in the well-reasoned case of Castle v. Eurofresh, the state defendants are obliged to ensure that their contractors, and by extension subcontractors, comply with federal law. What is key here is what federal law requires. And federal law requires the state defendants here, the CDCJ and the DOC, to ensure that its private contractors and subcontractors don't violate Title II. Castle v. Eurofresh also addressed an argument very much like the one the state defendants have made here and that Judge Mage relied upon heavily in his summary judgment order. In Castle v. Eurofresh, just to provide a little bit of context, the state defendants there, it was Arizona. It was the Arizona Department of Corrections. They contracted with a private entity to provide vocational services for individuals who were still in state custody, who were still in prison. And in that case, the state defendants argued that Title II doesn't apply because they had no authority to determine which jobs were available to inmates at this place called Eurofresh, the private entity, and they couldn't overturn Eurofresh's decision to refuse a request for a job modification. And what the Ninth Circuit held, and this is at page 909 through 910 of that decision, they held the state defendants are mistaken. The Ninth Circuit goes on to reason that presumably the state benefited from engaging in this contractual arrangement, but with that benefit also comes an assumption of the risk that the state's contractors are going to violate the ADA. And if that happens, then the proper defendant to hold accountable are the state entities that choose to enter into those contracts. That reasoning is squarely applicable here, and as the Ninth Circuit held at the end of its passage evaluating this question, the Ninth Circuit held, quote, The law is clear. The state defendants may not contract away their obligation to comply with federal discrimination laws. So to go back to Your Honor's original question, why didn't the state go into the issue of the facts of this case specifically, it's because they are resting their case principally on the mistaken notion that they can contract their way out of liability. And while I've cited a few cases here, I can actually go further and say that I'm unaware of a single case decided in any circuit which has held that through a set of contractual arrangements a state can contract their way out of liability under Title II or the Rehab Act. And the reason for that is likely because the regulations relevant to this issue are crystal clear, and they have the force of law. And what they say is that a state is properly held liable under Title II if it enters into these private arrangements through contractual or other arrangements. Or other arrangements, that's a direct quote. And what we've got here is an or other arrangement situation where, as this court is likely aware, the DOC and CDCJ, they contracted with Jefferson County, Colorado, and Jefferson County, Colorado contracted with the Nonprofit Intervention, Inc. Now, another important issue here, I think, in addition to the concept of the state itself being held liable for the decisions of its private agents, is whether or not work is a fundamental component of community corrections in Colorado. The answer to that question is no, it's not. Now, why is that relevant? Well, when a court's evaluating whether or not disability discrimination occurred in an actionable sort of way, an affirmative defense that's often raised relates to the issue of fundamental alteration. In other words... Unless I'm mistaken, the defendants have never argued, even in district court, that there was not a failure to accommodate or disability discrimination by intervention. They've only argued that CDOC and CJDC, get my acronyms mixed up, are not responsible for what intervention did. That point is well taken, and I believe the argument's been raised. I'm simply raising it here out of an abundance of caution. But yes, that point is certainly an accurate one, and I'm unaware of them having argued it either. But just to ensure that this important issue, perhaps in the court's view, is addressed, I want to just state, briefly anyway, that the CRS 1727-101.5, it spells out various purposes of community corrections, and work is not one of them. Moreover, under Alexander V. Tote's Supreme Court precedent, if the benefit itself, which here is community corrections, is defined in such a way that it effectively excludes people with disabilities, then that cannot stand under the ADA. And here, when it comes to the work requirement, if it effectively excludes people with disabilities, then it is impermissible under the law. Now, returning to a subject this court at least referenced to some extent a moment ago, which is the concept of what did the state do here? You know, I focus so far on what intervention did. The state itself has engaged in deliberate indifference, or at least a jury could reasonably find as much when it comes to the Marks case. For example, one person in the entire world received that letter I described, describing the disability discriminatory reason for Ms. Marks' regression of prison. Ms. Keller? DOC Community Parole Officer Susan Keller. And as she testified, that letter didn't even cause her any concern. She also testified that she didn't investigate the circumstances surrounding Ms. Marks' regression. Under Ninth Circuit precedent, UPDEC is the name of the case, a lack of an investigation alone is sufficient evidence of deliberate indifference to present the question of damages to a jury in a Title II case. Well, let's say hypothetically that Parole Officer Keller did investigate, she would have found that what intervention said was true. She couldn't physically work. Respectfully, that's actually a disputed issue of material fact. As Ms. Marks testified, she was willing and able to work in certain jobs that would have comported with her physical restrictions. For example, in the record there's a sworn statement from an individual named Mark Vester. He worked at a place called Phase 5 in Federal Heights. And what he adheres to in his sworn statement is that he offered Ms. Marks a job where she could have had a sedentary sort of role. And the evidence also shows in the record Ms. Marks conveyed that to intervention staff and they never followed up on it. As Ms. Marks also testified, she conveyed to intervention staff that she was willing to do sedentary jobs from within the facility, like making phone calls, for example. And no one offered her that either. However, even assuming Ms. Marks wasn't able to work, which is actually not what the record shows, but even assuming that work itself cannot be considered a fundamental aspect of this program because, as I mentioned earlier under Alexander V. Choate, the benefit itself can't be defined in a way that effectively excludes people with disabilities. If this court were to say that work has to always exist in order for somebody to be in community corrections, that wouldn't square with Alexander V. Choate. And, in fact, at intervention itself, there was a program called the John Eshon Reentry Program that didn't require some people in that facility to work. It was for people with co-occurring mental health and substance abuse issues. But the point is there are just voluminous amounts of facts upon which a jury could conclude that the way Ms. Marks was treated here simply did not comport with the law. And I mention all this to say that let's say Ms. Keller had objected to the way Ms. Marks was being regressed. There's a lot of evidence upon which a jury could conclude that that might have made a difference. But even if it hadn't, the simple fact that agents of the state engaged in this discriminatory decision intentionally, that alone is a sufficient basis under binding precedent to hold the state liable. If there are no remaining questions, I'd like to reserve the remainder of my time for rebuttal. Okay. You can stop the clock. Do you have any questions? No. Judge McKay, do you have any questions for the appellant? No, I have no questions. Okay. Thank you. We'll hear from the appellant. Good morning. May it please the court. I am Assistant Attorney General Catherine Smith representing the Division of Criminal Justice, the Department of Corrections, the appellees. The pivotal issue in this case is whether the Colorado Division of Criminal Justice and the Department of Corrections and its named employees are liable for the decision of the administrator of intervention to return Ms. Marks to prison. They are not liable for four reasons. The first is that the state cannot contract away authority it does not have. The second is that under the statutory scheme, the state has no authority to undo or reverse the decision made by the staff of intervention. The third reason is that there is no agency relationship between the Division of Criminal Justice or the Department of Corrections and intervention. And the final reason is that the real parties in interest in the case are Jefferson County and Intervention, Inc. They were parties to the case. They were sued and they settled. With regard to contracting away, the statutory scheme delineates the responsibilities of the various parties involved in providing community corrections programming in Colorado. The statute gives authority exclusively to the administrator of community corrections programs to make the determination whether a person should be returned to prison. What about Administrative Regulation 250? How does that play into this? Administration Regulation 250, which is a Department of Corrections regulation, does not overturn the statute and doesn't supersede the statute. It's providing a statement of policy that the community corrections officers are using when they're determining who to refer. Well, it also says that the Colorado Department of Corrections administers and monitors community corrections, doesn't it? It includes that statement, but if you look at what that means as a practical matter, is that in making the determination whether or not they will continue to place people in corrections facilities, a particular program, they're evaluating and assessing. But they are not in a statutory or contractual position to influence the nature of the actual programming. Well, where does it say that in the regulation or in a case? I mean, your first argument is that the state can't contract away authority it doesn't have, and the entity that administers the very statute, the state statute that you're relying on, if it was federal law, we'd apply our deference or a Kaiser deference, but that entity says that you're wrong, that the Colorado Department of Corrections does administer and monitor the whole program, community corrections, which is the program involved here. But if you look at the statutory scheme, the authority to set the standards that are applied statewide for the operation of community corrections, the authority to enter into contracts with the local authorities that are forming the community corrections boards, and the authority to audit rests with the Division of Criminal Justice. How does that help you? The Colorado Department of Criminal Justice is one of the defendants. I understand that, but I don't see how a Department of Corrections internal policy statement and regulation could overturn the statutory scheme. Well, but the Colorado Department of Criminal Justice, as I understand it, contracted with Jefferson County, which then contracted with Intervention. And so the whole food chain starts with the entity that you're pointing to, the Colorado Department of Criminal Justice. There would be no contract had it not all stemmed from the Colorado Department of Criminal Justice. So why is the Colorado Department of Criminal Justice contracting away authority it doesn't have? There would be no community corrections program were it not for the contract that stemmed from the Colorado Department of Criminal Justice. So the Colorado Department of Criminal Justice does not have statutory authority to actually operate a community corrections program, and they don't operate community corrections programs? Right. They contract with Jefferson County. Correct. Right. So when you say it can't contract away authority it doesn't have, I don't understand how I get from A to Z with your argument. So I'm distinguishing between the authority to supervise a program at a very high level and the authority to actually conduct the actual day-to-day operations of a community corrections program. Okay, well let's say that you have the intervention program. Who sets the standards that would govern the intervention community corrections program? Isn't that the Colorado Department of Criminal Justice? So it is, there are two state, it's the Colorado Department of Criminal Justice having the authority to set the floor with regard to the standards, and then Jefferson County cannot contradict any of those standards, but they can put in place more stringent standards. So the scheme under which intervention would be operating is established both by the Division of Criminal Justice and Jefferson County Board of. . . Ultimately creates the minimum requirements that would guide community corrections administered by intervention, right? Correct. Okay. Correct. So it does have authority. The CDCJ does have authority. The CDCJ does. Okay. The Department of Corrections does not. All right, so we should reverse on CDCJ but not on CDOC? No, you should not. Well, how can we avoid that? Well, I do think that the scheme that has been developed by Colorado's legislature is a reasonable scheme that is enacted under federalism, and it is a valid exercise of state sovereignty. The case law is clear that the state of Colorado has authority to determine the authority of the localities, and here what we have is a state statute which is allocating the authority of the locality. Under the statute, Jefferson County is the party that has authority to either operate a community corrections program or, as it did here, to enter into a separate contract with another party that would operate the community corrections program. So the statute itself is allocating responsibilities. The scheme, I think it's also important to look at the policy reasons behind the scheme and its purposes, and those policies include creating a collaborative environment where the communities feel that they have a level of control over who is entering their community. The scheme recognizes that we're dealing with an offender population, that they pose risks to the community, and a great deal of authority rests at the communities, because it's the only way the scheme really can work as a practical matter, and with that additional responsibility at the community level comes additional liability. The scheme does not evade the Americans with Disabilities Act. She has recourse under Title III of the ADA to Jefferson County and to intervention, and so it's... But we know that the reason that's right, is this correct, is that Jefferson, I mean, intervention is contractually obligated to comply with the ADA, right, in its contract with Jefferson County. It is. And Jefferson County is contractually obligated to include that requirement with intervention, because CDCJ makes that a condition of its contract with Jefferson County, right? Yes, it's an express condition of the contract between CDCJ and Jefferson County that any subcontractors comply with the ADA. Okay. Okay. And all the money comes from CDCJ too, right? There would be no money for Jefferson County to pay intervention had it not been for the pool of money that comes in from the federal government to CDCJ, right? So I don't know how much of the money that the CDCJ allocates comes from the federal government, and that information is not in the record. Right. But in general, your description is correct. Right. So the program, without regard to how much, and I threw a muggy wrench into it, without regard to how much comes from the federal government, any money that is paid from Jefferson County to intervention comes from the state entity that he sued, one of the state entities that he sued, CDCJ, right? So... I'm just saying the Community Corrections is ultimately funded by CDCJ. The vast majority of the operations are. I don't know, and there's no information in the record, whether Jefferson County makes any kind of matching contribution, and I just don't want to mislead the court, but if you look at the contract, there is a contract also between the Department of Corrections and Jefferson County for ancillary services related primarily to drug and alcohol testing, and for those services, the Department of Corrections also is making a nominal payment. But the vast majority of the money comes from payments from the CDCJ, which by the terms of its contract, Jefferson County gets a per-participant, per-month contribution. I do want to talk a little bit about the case law. The case law that Ms. Marks has cited is distinguishable on two primary grounds. One is that the prison cases are cases where the locality is responsible for... where the services that are being provided are prison services as opposed to community corrections services, and those are not the same kinds of services. And I also did want to let the court know that the definition of a community corrections program specifically includes obtaining and holding regular employment. It also includes correctional goals, and that's at 1727.102.3. With regard to Phillips v. Tiona, another important distinguishing fact is that in that case, the government had the power to determine who would enter the program and who would leave the program. Here, neither the Division of Criminal Justice nor the Department of Corrections has that authority. I see that I have... Well, is that right? The CDCJ doesn't have authority to say whether or not Ms. Marks was going to go into the community corrections? I mean, I... That is correct. They do not have that authority. The decision-making authority rests with the Jefferson County Board of Corrections and with intervention. It's not an issue in this case, but they don't possess that authority. Well, maybe... Okay, and maybe I'm just reading into what you're saying, but maybe it's just semantics. But, I mean, the request has to come from somewhere. I mean, Jefferson County didn't say, okay, let's pull Ms. Marks out of the state prison system and put her into community corrections. That must have come from... That came from the Department of Corrections. Okay, that's okay. That request. But they don't have authority to mandate that any program accept her. I got you. I understand. And they don't have any authority to mandate that any program keep her. Okay. I understand. Okay. I have very little remaining time. I don't know whether you have other questions. No. Judge McKay, do you have any questions for the appellee? No, I haven't any. Okay. Thank you very much. Thank you. We'll hear from the appellant for his rebuttal. Thank you. One of the state's primary arguments here seems to rely on federal, or excuse me, state law. And the state is doing so mistakenly. The key question here is what federal law requires. Under federal law, the state not only had the authority, but also the duty to ensure that Title II of the ADA and Section 504 of the Rehab Act was complied with here. That's consistent with Phyllis V. Tiona from this circuit, Armstrong V. Schwarzenegger from the Ninth Circuit, Castle V. Eurofresh from the Ninth Circuit, and many other well-reasoned decisions that have evaluated this question. Another major argument the state seems to have been making, and has done so unsuccessfully, is that the state wasn't involved at all with Ms. Mark's community corrections placement. This court correctly pointed to AR 2015-250-15, that's at page 475 of the appendix, which maintains an ongoing monitoring role for the DOC. Moreover, Ms. Marks remained in the legal custody of the DOC throughout the time that she was in community corrections. Her community parole officer, Keller, monitored her throughout the time she was in community corrections. The DOC referred her to community corrections. The DOC took her back after the end of her time in community corrections. Also, the contracts between this DOC in Jefferson County, and also the CDCJ in Jefferson County, expressly maintain an oversight role for those two entities when it comes to the community corrections program itself. So it's just simply not factually supportable for the state to try to wash itself of any responsibility here. Moreover, as I said, the law doesn't allow for it. Federal law does not. Another issue here seems to be the question of whether the fact that Ms. Marks pursued claims against Jefferson County somehow affects her ability to also pursue claims against the state. I think a fair analogy here is to many other civil cases where there are multiple defendants, each of whom bear some responsibility for the harm done. Jefferson County was properly sued here, but that doesn't mean that there aren't other proper defendants here. And ultimately, in our view, the buck stopped with the state, because this is fundamentally the state's program to ensure that federal law was complied with. And so any issue here relating to suing multiple defendants comes down to the question of allocation of damages, which could be easily addressed in a jury instruction, and not to the question presented here, which is whether or not a jury should be able to potentially find the DOC and CDC J liable for damages. Also, when it comes to funding, the DOC also provided funding to Ms. Marks' community corrections program. I think that's relevant to evaluating whether or not the district court's summary judgment order with respect to the DOC should be reversed. That's, among other places, in the appendix at page 448, provides further proof that the DOC, as a matter of fact, in addition to law, was entwined in the community corrections program at issue here. And finally, I want to return to the core point, a core point, that the state here cannot engage in disability discrimination through, quote, other arrangements. That comes from the pertinent regulations. Those are regulations that were cited with approval in Phillips v. Tiona. This is an other arrangement scenario. Is it complicated? Yes. Is the fact that it's complicated a reason for the state not to be held liable? We respectfully submit that the answer to that question is no. Can I ask you a question on an issue that you haven't raised today, but it's in your both sides' briefs and we have to decide it, and that's your 1983 equal protection claim. Sure. Not with regard to abrogation of 11th Amendment immunity, but on your standalone equal protection 1983 claim, my understanding is that you agree with the defendants that rational basis test applies. Is that true? That's incorrect. What we acknowledged is that under case law, which we believe is incorrect, it's rational basis. Well, okay. You reminded me. Unless the Supreme Court changes its mind, based on existing ‑‑ I didn't mean to talk over you, or else my question was bad, because you're right. You're arguing that the precedent is wrongly decided, but under existing precedent you're agreeing that rational basis applies, right? That's correct. Although, under Caroline Product's footnote 4 and the rationale that's emanated from that, individuals with disabilities are a discrete and insular minority with a robust historical record of being subjected to discrimination on the basis of their disabilities. We contend that at least intermediate scrutiny should apply based on those factors. However, as also noted in the briefing, even under rational basis review, there's a jury question here when it comes to whether or not it was rational to regress Ms. Marks to prison without even attempting to reasonably accommodate her disability, and notwithstanding the fact that she didn't have any other noteworthy issues that arose while she was in community corrections. Well, one of their arguments is she's complaining that she got injured because they didn't have ADA-compliant showers. And so if she gets injured because the community corrections facility doesn't have ADA-compliant showers, you're saying it doesn't even pass the rational basis test to say, we need to get her out of this community corrections program. She's going to get hurt again. I mean, why is that not a rational reason to get her out of the community corrections program? Respectfully, Your Honor, none of the current or former defendants during the events underlying this case ever articulated that reason for regressing her. Their reason for doing so was clear, which was her purported inability to work. Moreover, even assuming perhaps this particular facility wasn't suitable for her, the fundamental basis for our equal protection claim is that Ms. Marks was removed from the community and placed back into a traditional prison setting because of her disability. This happened with the DOC's knowledge, under the DOC's watch. Where else would they put her? I mean, she's still in state custody. They can't say, you know, go out on the street. No, of course not. We're not contending otherwise. But we do contend she should have remained in the community. There are other community corrections facilities. The intervention one in Jefferson County, as the DOC and CDCJ were well aware, wasn't the only one. There are other facilities in other counties that perhaps would have been a more suitable fit for her based on her physical issues. Okay, let me ask you a hard question. It's a good argument. But have you made that before just now? Yes, we have. Our argument has been. Did you make it, I'll start with, to us? Did you put that in? I'm not trying to trip you. That just caught me off guard. I've read your brief really, really closely. I don't remember seeing that. I appreciate that. I respectfully submit it. It's an argument that we have made. And basically it boils down to the fact, I think this is a fair summary in any event, that the DOC was on notice that Ms. Marks was being sent back to prison because of her disability, and they let it happen. Okay. Do you have any questions? No. Judge McKay, do you have any questions? No, I have none. Okay. Thank you, counsel, for both parties. I think both parties did a splendid job in your written and oral submissions. Thank you for your excellent advocacy. This case will be submitted. Court is in recess.